UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

IRWIN R. CAESAR,                :
        Plaintiff,          :
                       :
   v.                     :     C.A. No. 17-cv-00130-S-PAS
                       :
AAA NORTHEAST,         :
        Defendant.     :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Plaintiff, Irvin R. Caesar, has sued his former employer, Defendant, AAA Northeast ("AAA"), alleging that he was fired in retaliation for his opposition to AAA's tolerance of a sexually harassing work environment affecting the employees who staffed its telephone call center during the nightshift.[1]  His claim is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws §§ 28-5-1, *et seq.*, and the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws §§ 42-112-1, *et seq.*  ECF No. 1-1 at 4.  The matter is before the Court on Defendant's motion for summary judgment.  ECF No. 19.

I.     **Factual Background**[2]

     A.     Background Regarding AAA

---

[1] Caesar has abandoned the claim that he was the victim of race discrimination.  ECF No. 21 at 21.

[2] As required by Tolen v. Cotton, 572 U.S. 650, 660 (2014) (per curiam), this factual recitation examines the proffered evidence in the light most favorable to Caesar, who is the nonmoving party.  Except as otherwise indicated, these facts are drawn from the parties' statements of undisputed facts with any matters that are disputed noted in the text.  Caesar's statement, with AAA's responses, are at ECF No. 25 ("PSUF").  AAA's statement, with Caesar's responses, are at ECF No. 23 ("DSUF").  Because of an error in the numbering of Caesar's response to AAA's statement, the numbers in ECF No. 23 after ¶ 31 are off by one from the original set at ECF No. 20.  In this report and recommendation, references to "DSUF" are based on the numbering scheme in ECF No. 23.

AAA is a member service organization that provides emergency roadside assistance to members who can call for help to a telephone call center that is staffed with trained AAA employees year-round, twenty-four hours a day, seven days a week.  DSUF ¶¶ 1, 3.  AAA's mission is to provide "Five Diamond service" to its members, to "do everything we can to help and serve [our members'] needs[, as] part of the exceptional member experience that they should expect."  DSUF ¶¶ 7-8.  Members contacting the AAA call center for roadside assistance are often in stressful or vulnerable situations and AAA requires that their issues be handled in a sensitive, skilled, and respectful manner.  DSUF ¶¶ 5-6.  To that end, AAA's employees are trained at new hire orientation that call center employees must tolerate some profanity from upset members.  DSUF ¶¶ 9, 14.  The pertinent training slide states: "[a]lways, at first, try to ignore the swearing[,]" but if it is repeated more than three times after the member has courteously been asked, "don't use those words," the employee should "[i]nvolve a supervisor immediately."  ECF No. 20-1 at 117.  This directive concludes with the statement: "[n]ever hang up on a member."  DSUF ¶ 14.  During the period in issue, Jeff Adams ("Adams") was the director of the call center at AAA's Providence, Rhode Island headquarters; Charlie Newton ("Newton") was its manager; Michael Galego ("Galego") was its assistant manager; and Stephanie Tomasso ("Tomasso") was its human resources ("HR") business partner.  DSUF ¶¶ 2-4.

    B.    <u>Caesar's Hiring and Early Expressions of Opposition to Sexually Harassing Conduct during Call Center Nightshift</u>

In August 2015, AAA hired Caesar and assigned him to be the supervisor of the nightshift call center; he was the only supervisor working throughout the overnight hours.  DSUF ¶¶ 10-11, 13.  The parties dispute what Caesar was told during and after his new hire orientation about hanging up on callers who use profanity: AAA's Newton claims that AAA has "zero tolerance for . . . hanging up on members," and that "[i]t's a terminable offense," while Caesar

testified to his understanding that it was "common knowledge" that AAA's employees could end

a call if it was of a "sexual nature" with the "individual breathing or talking sexual on the

phone," as well as that, if "[s]omebody is cursing out, calling you names, telling you that they

are getting you fired, you don't stay on that call."  PSUF ¶¶ 1-2; DSUF ¶¶ 9, 14-16.

On September 8, 2015, approximately one week after he started, Caesar forwarded an

email[3] to his direct supervisor, Newton, informing him of an array of issues with the work-place

conduct of nightshift employees.  This email includes the following:

> From my observation, I've noticed that we have some great employees that come
> in and do their job well every night. . . .
>
> There [also] have been employees watching questionable things on the companies
> [sic] desk top computer that could possibly turn into [a] liability issue for the
> company if another employee is offended by it. . . .
>
> 2.      Use of phone and tablets – if an employee is watching an explicit video or
> listening to explicit lyrics on their phone or media device it could open the door
> for a complaint by another employee. (example: last night an employee['s] device
> went off and I could hear the words B****, B****, B****. . . .
>
> 8.      Sexual Harassment and Discrimination: Ha[s] everyone on my team been
> trained on this subject.  If there is a situation where an employee . . .
>
> Please advise a good time for us to discuss[] these issues.

PSUF ¶¶ 3-4 (quoting ECF No. 22-1 at 2-3).  Although Newton "up-channeled" the

request for sexual harassment training to his supervisor, Adams, neither Newton nor

Adams did anything to address Caesar's belief that nightshift employees were engaged in

workplace conduct involving sexually offensive material serious enough to expose AAA

to liability.  PSUF ¶¶ 148-49, 154; ECF No. 22-3 at 5.  Caesar was told nothing in

---

[3] The authenticity of the emails on which Caesar relies is not disputed.  See Joseph v. Lincare, 989 F.3d 147, 155 (1st Cir. 2021).  AAA does dispute the truthfulness of their content.  This dispute is not material – Caesar relies on the emails not for the truth of the content, but to show that an email was sent or that AAA was informed of the information contained in it.  See Noviello v. City of Boston, 398 F.3d 76, 84-85 (1st Cir.2005).

response to his inquiry about sexual harassment training.  PSUF ¶ 148.  Despite Caesar's inquiry, at no relevant point did AAA provide sexual harassment training to the nightshift employees.  PSUF¶ 154.

On October 5, 2015, Caesar emailed Newton and Tomasso, among others, about one of his supervisees who was rapping at his desk; this email raises the concern that "if he raps one wrong word and it's heard on the phone or by another employee, it could cost the company a lot of money and management hours."  PSUF ¶ 18.  This email also reiterates Caesar's concern from a month earlier that "[t]here have been employees watching questionable things on the companies [sic] desk top computer that could possibly turn into [a] liability issue for the company if another employee is offended by it."  ECF No. 22-1 at 36.  While AAA promised follow-up with the rapper, there was still no response to Caesar's now twice repeated request for help based on his belief that AAA faced risk of liability from nightshift employees being exposed to a sexually harassing workplace.  Id.

On October 28, 2015, Caesar tried a third time, emailing Newton and Gallego with a request for assistance with his supervisees' "computer usage" – "what is and isn't appropriate in the workplace."  PSUF ¶ 20; ECF No. 22-1 at 39-40.  This email concludes: "the suggestive photos [below] can be seen and are enough to offend another employee in my opinion."  ECF No. 22-1 at 39-40.  Four screenshots are attached, all consistent with Caesar's characterization of them.  During his deposition, Caesar amplified on this concern, testifying that, "while walking through . . . the call center[,]" "some of the things he saw [on employee computers] included seeing someone naked like Nicki Minaj or belly dancers with little clothes on."  PSUF ¶ 147.  It is disputed whether

4

Caesar told Newton that he saw "someone naked." Id.  Newton and AAA never responded to Caesar's request for help.  PSUF ¶¶ 67-68.

At some point during his first weeks on the job, Caesar became aware that one of his supervisees, a woman named Caitlyn Duclaw ("Duclaw"), was being investigated by AAA's HR department based on a co-worker complaint that she had called him a pedophile.  PSUF ¶ 100; DSUF ¶ 48.  In reliance on the limited information he knew, Caesar believed that the complaint that Duclaw had improperly used sexually harassing language was sustained[4] (and the complaining employee's seat was moved) yet no adverse action was taken against Duclaw.  PSUF ¶¶ 81, 93-95, 100-102.  Instead, Newton told Caesar to "manage" the employee who complained about sexual harassment by Duclaw "out of AAA."  PSUF ¶ 102.  Caesar believed that AAA was protecting Duclaw despite her use of a sexually derogatory term directed at a co-worker.  PSUF ¶ 95.

By early November, Caesar claims that he was alerting Newton to the use of loud and obscene language by nightshift employees.  Specifically, on November 3, 2015, Caesar emailed Tomasso to advise her of an employee who "yell[ed] out an obscenity," which he had also brought to Newton's attention.  PSUF ¶ 22; ECF No. 22-1 at 43.  In mid-November, Caesar met with three employees about their concerns regarding the workplace conduct of coworkers.  DSUF ¶ 17.  Two of them complained that Duclaw and others on the nightshift were speaking loudly and inappropriately or provocatively.  See ECF No. 20-1 at 276, 278.  It is disputed whether at some unspecified time, the third employee told Caesar that Duclaw made "vulgar comments."  PSUF ¶ 97-98.  Caesar believed that these concerns were similar to those he had raised earlier.  DSUF ¶ 17.

---

[4] AAA disputes Caesar's conclusion about this incident.  Tomasso testified that the investigation revealed that the allegation was unsubstantiated.  ECF No. 20-1 at 101.

Caesar also came to believe that this "conduct was an ongoing thing with . . . Duclaw harassing employees."  PSUF ¶ 99.  The parties dispute whether Caesar mentioned these complaints to Newton at the time he heard them.  DSUF ¶ 17.  It is undisputed that, at no time during November 2015 (or at any time since September 2015, when Caesar first raised the concern), did AAA do anything to address Caesar's repeatedly reported concerns that nightshift employees were being exposed to a sexually harassing work environment.  See PSUF ¶ 154.

      C.      Thanksgiving Member Call

At 4:15 a.m. on Thanksgiving morning (November 26, 2015), a member contacted the call center asking for help with a dead car battery.  DSUF ¶ 19.[5]  The responding employee provided an estimate of ninety minutes or less before help would arrive.  Id.  Unsatisfied, the member asked for a supervisor.  Id.  Caesar (the only supervisor available) took the call; the member was irate about the wait.  Caesar repeatedly gave her the same estimated arrival time and told her that the only other option was for him to call the police if she was not in a safe location.  DSUF ¶ 20.  As the member became more upset, she said, "[O]kay, I'm in a safe fucking location.  I need you to call the damn driver and expedite the call.  Do you understand?"  Id. ¶ 21.  Caesar responded, "you're cursing; I'm going to end this call.  The driver will be there in 90 minutes."  Id.  The member said, "You are not going to end this call" and threatened to get Caesar fired.  Id.  With "[y]ou have a good day," Caesar hung up on the member; disputed is Caesar's claim that he did so politely.  ECF 20-1 at 371; PSUF ¶ 71.

The member promptly called back; this time she reached Duclaw.  Duclaw placed the member on hold and spoke briefly to Caesar; he instructed Duclaw to repeat the waiting time of

---

[5] This and the subsequent conversation between the same member and Caesar, together with the second call between the same member and Duclaw, are collectively referred to as the "Thanksgiving Call."

ninety minutes and "end the call." DSUF ¶ 22. It is undisputed that Duclaw did not follow Caesar's instructions in that she did not abruptly end the call. DSUF ¶ 24. Rather, she spoke empathetically to the member, suggesting other solutions. See ECF No. 20-1 at 435. By the time the call between Duclaw and the member ended twenty-two minutes later, the member was calm and appreciative. DSUF ¶ 24.

Immediately after the call ended, Caesar reprimanded Duclaw for not following his instruction and she told him that she disagreed with his perspective and that she was going to report the issue to Caesar's "boss," that is, to Adams. DSUF ¶ 25. Immediately following the end of the shift, both Duclaw and Caesar sent long emails up the chain of command, each defending her/his conduct in the handling of the Thanksgiving Call. DSUF ¶¶ 26-28. First, at 7 a.m., Caesar emailed Newton and Gallego explaining that he had ended the call when the member "was lying and began swearing," and that Duclaw was insubordinate when she stayed "on the call with the member for 22 minutes." DSUF ¶ 27; ECF No. 20-1 at 49. Thirty-nine minutes later, Duclaw emailed Adams, explaining that she was proud of how she had calmed the member consistent with AAA's standard of premier customer service and describing her anxiety over continuing to work with Caesar in light of this incident. DSUF ¶ 26; ECF 20-1 at 53-54. Ultimately, several of AAA's management team (e.g., Newton, Tomasso and Adams) listened to the Thanksgiving Call. All found that Caesar's approach was contrary to AAA's mission of service to members, while Duclaw's approach was consistent. E.g., DSUF ¶ 39.

> D. Caesar's November 28, 2015 email Regarding Loud, Inappropriate and Provocative Language by Duclaw and Others During the Nightshift

On Saturday morning following Thanksgiving (forty-eight hours after his email complaining of Duclaw's "insubordination" in handling the Thanksgiving call), Caesar wrote another email. This email, dated November 28, 2015 ("November 28, 2015 email") reverted to

the theme of Caesar's earlier emails, which had expressed his belief that nightshift employees were being exposed to the sexually inappropriate workplace conduct.  PSUF ¶ 24; DSUF ¶¶ 31-32.  Addressed to Newton, with copies to Tomasso, Galego and Adams, Caesar wrote[6] that, earlier in November, he had received complaints from two employees that their ability to work was interrupted by "inappropriate" comments being made by co-workers including Duclaw. ECF No.20-1 at 274-281.

Caesar attached to the email handwritten statements from two workers and promised that there would soon be a statement from a third; one of the two attached statements accused Duclaw and others of "continuously speaking loud & laughing or speaking inappropriately while [the co-worker is] on the phone."  ECF No. 20-1 at 276.  The third statement is also in the record; dated the next day (November 29, 2015), it states that Duclaw and others "talk provakly (sic)" and "go out of their way to make other call reps feel uncomfortable. . . . I do my best to stay clear of them!"  ECF No. 20-1 at 278.  Caesar's November 28, 2015 email to AAA management reprises his inquiry (ignored by AAA) from months earlier about sexual harassment training: "I would like to suggest that every employee watch a sexual harassment/discrimination/Sensitivity in the workplace training video."  ECF No. 20-1 at 274.  In writing this email and in sending the statements to AAA management, Caesar believed that the employees had reported sexual harassment to him and it was his job to report it to his employer.  PSUF ¶ 113.  Caesar claims that the November 28, 2015 email is the "protected activity" that triggered the retaliation that culminated in his firing.  PSUF ¶ 91.

    E.    <u>AAA's Response to the Thanksgiving Call and the November 28, 2015 email</u>

---

[6] The November 28, 2015 email also raised other issues.  Because they are not relevant, they are omitted from the description above.

On Monday, November 30, 2015, following the Thanksgiving Call, AAA's management team, Adams, Tomasso and Newton, discussed the situation.  DSUF ¶¶ 42-43.  They decided that Newton and Galego would meet with Caesar on December 1, 2015, to discuss both the Thanksgiving Call (focused on Caesar's handling of the Call and his treatment of Duclaw following the Call) and the November 28, 2015 email (focused on Caesar's conduct in taking statements from supervisees).  Id. ¶ 43.  They also agreed that Tomasso and Adams would separately investigate (for the first time) the reports of sexual harassment in Caesar's November 28, 2015 email; they decided to conduct this investigation during the nightshift of December 2-3, 2015.  DSUF ¶ 44.

Newton and Galego met with Caesar for over an hour during the nightshift on December 1, 2015.  DSUF ¶¶ 45; ECF No.20-1 at 437.  Newton opened the meeting aggressively, telling Caesar that "people get fired for hanging up on members," as Caesar had done during the Thanksgiving Call, while stating that Duclaw had handled the Call appropriately.  See ECF No. 20-1 at 163, 288-89, 435.[7]  Newton and Galego also questioned Caesar closely about whether he told Duclaw she had "disobeyed a direct order," DSUF ¶ 47, but asked him nothing about her "inappropriate" workplace language.  Next, Newton attacked Caesar for taking statements from his supervisees, directing that, "under no circumstances" was Caesar to take a statement from an employee.  ECF No. 20-1 at 437.  In response, Caesar reminded Newton that he had raised his concern about nightshift employees being exposed to a sexually harassing work environment "a

---

[7] The parties' statements do not lay out the entirety of discussion during the December 1, 2015, meeting; however, the record is replete with each parties' descriptions of it, and they are not materially different as to what was said.  Compare ECF No. 20-1 at 435-36 (Galego memorandum describing December 1, 2015, meeting), with ECF No. 22-1 at 58-59 (Caesar email describing December 1, 2015 meeting).  The only noteworthy potential dispute about this meeting is whether AAA would agree that Newton was "intimidate[ing]" and "com[ing] after me," as Caesar described.  ECF No. 20-1 at 163, 288-292.  In light of AAA's silence on this point, the Court assumes that AAA would dispute that Newton was aggressive and attacked Caesar during this meeting.

few months ago," and Newton never responded; Caesar asked Newton if this ban on statements was because "[y]ou want me to suppress all this[?]"  ECF No. 20-1 at 436, 438.  In his post-meeting email to Newton, Galego, Adams and Tomasso (written at 5 a.m. the next morning), Caesar expressed his view that AAA's "priority was not to speak with the employees regarding their concerns about inappropriate comments instead it was to reprimand me for accepting their statements regarding inappropriate comments in the workplace."  ECF No. 22-1 at 58-59.  It is undisputed that AAA had no written policy barring a supervisor like Caesar from accepting a statement from an employee and passing it on to his supervisors and HR.  PSUF ¶44.  Caesar and others (outside of HR) had done so in the past.  PSUF ¶¶ 93, 96, 105-07, 128; DSUF ¶ 82.

     F.    <u>Caesar's Alleged "Retaliation" Against Duclaw and Her Response</u>

Towards the end of the Caesar's December 1, 2015, meeting with Newton and Galego, Caesar referenced employees who are problematic and require supervision and asked why Duclaw was training new hires.  ECF No. 20-1 at 436.  Apart from Newton's confirming that Caesar has the responsibility to decide who to pair with a new trainee, the issue was not discussed further.  ECF No. 20-1 at 436.  Immediately after he left the meeting, Caesar approached Duclaw and the new hire she was training; he transferred the trainee to another employee.  DSUF at ¶ 48.  Caesar claims that he did this because there had been three complaints about Duclaw's sexually inappropriate workplace conduct yet AAA management had failed to address them, including when he specifically asked about it during the meeting with Newton and Galego.  DSUF ¶ 49; PSUF ¶¶ 83, 118.  It is also undisputed that Duclaw is not a certified trainer.  PSUF ¶ 121.

Duclaw reacted swiftly to Caesar's treatment of her in removing the trainee.  At 1:16 a.m. on December 2, 2015, she emailed Adams advising him that Caesar had removed her as an

assigned trainer in retaliation for her report on the Thanksgiving Call and that she wished "to file an official complaint with HR."  DSUF ¶ 49.  It does not appear that Caesar knew that Duclaw had done this.

At 5:13 a.m., Caesar sent his own email to Newton, Galego, Adams and Tomasso.  ECF No. 22-1 at 58-59.  In this email, Caesar wrote bitterly about the meeting with Newton and Galego, characterizing it as a "witch hunt."  ECF No. 22-1 at 59.  Caesar advised the recipients of his email that, for months, AAA had ignored his repeated request for sexual harassment training for the nightshift and that, instead of dealing with the latest complaints, Newton had attacked him for taking statements memorializing what was happening.  PSUF ¶ 126; ECF No. 22-1 at 59.  Caesar also explained his decision to remove the trainee from Duclaw.  ECF No. 22-1 at 58.

G.    AAA's Sexual Harassment Investigation, December 2-3, 2015, Meeting
       with Caesar and Caesar's Termination

During the nightshift on December 2-3, 2015, Adams and Tomasso began their investigation into the claims of sexually harassing conduct in Caesar's November 28, 2015 email.  Although Duclaw's complaint of Caesar's retaliation had been received just hours before, they decided to investigate it at the same time.  DSUF ¶¶ 51-52.  By contrast, they did not include in their investigation Caesar's accusation (in his December 2, 2015, email, also sent hours earlier) that AAA, acting through Newton, was covering up Caesar's opposition to sexually harassing behavior on the nightshift.  See PSUF ¶ 126.

After speaking with five employees, Adams and Tomasso concluded that some nightshift employees, including Duclaw, were loud and that their conversations at times were "inappropriate," for example that one employee made comments about her sex life and that Duclaw sometimes would "chime in."  DSUF ¶¶ 53-55.  These findings resulted in the

determination that discipline was required because the conduct that had occurred was unprofessional, but that it did not amount to sexual harassment.  DSUF ¶ 69.  During the course of these interviews, some employees (including Duclaw) also complained about Caesar's approach to supervision, claiming that he was aggressive and used favoritism.  DSUF ¶ 54.

The last person that Adams and Tomasso met with was Caesar.  DSUF ¶ 56.  This meeting lasted for about forty-five minutes and was recorded by Caesar so there is no ambiguity regarding what was said.  DSUF ¶ 56; PSUF ¶ 132.  Tomasso began the interview by reiterating Newton's criticism of Caesar for taking the statements referenced in the November 28, 2015 email, explaining that AAA does not have a "general practice of supervisors gathering statements from employees," although Tomasso conceded that there is no specific policy.  ECF No. 20-1 at 285-86.  Caesar shifted the discussion to his meeting with Newton the night before, which he said had been "pure intimidation" because Newton "attacked" him and threatened to fire him.  Id. at 288-91, 300.  Caesar stated that Newton praised Duclaw for her telephone skills, which Caesar conceded are good, but he emphasized that AAA should be talking about Duclaw's "issues with improper comments."  Id. at 291-92.  Tomasso and Adams responded by reverting to AAA's criticism of Caesar for taking statements, saying "we don't want it to turn into a situation where employees are feeling pinned against each other and writing statements about each other."  Id. at 292.  Tomasso and Adams stressed that nightshift employees had given them both positive and negative feedback concerning Caesar and his approach to management.  Id. at 317-18.

When Caesar reintroduced the topic of sexual harassment during the nightshift, Tomasso and Adams finally told him that "we're having conversations with the employees [to] enforce what you're trying to do" and encouraged Caesar to have a general conversation with employees

concerning what is appropriate and inappropriate; however, they provided no specific guidance and asked no questions about what was going on, instead immediately pivoted to Duclaw and the Thanksgiving Call.  Id. at 329-41.  After Caesar acknowledged that his handling of the Call was a mistake, but expressed consternation at Newton's assertion that he might be fired for it, id. at 334-40, they bore in, questioning Caesar regarding what precisely he had said to Duclaw after the Call ended.  Id. at 341.  Caesar resisted answering, pointing out that Newton had already grilled him about this and repeatedly referring them to his "statement" (his email to Newton and Galego of November 26, 2015, copies of which had been forwarded to both Tomasso and Adams).  When Tomasso suggested that Caesar was getting a "little defensive," Caesar responded, "I am being badgered right now about the same thing."  ECF No. 20-1 at 344-45.

When Caesar did try to answer their questions, Tomasso and Adams launched into a detailed inquiry, for example asking him to tell them exactly when in the sequence of the conversation with Duclaw did Caesar accuse her of insubordination.  Id. at 348.  As they pressed him, Caesar became more upset and pointed out that Duclaw is the "person that has been accused of inappropriate language three times."  Id. at 349.  When he said this, Tomasso shifted to asking Caesar why he removed the trainee from Duclaw.  In response, he pointed out that he had already explained his reasons in his email of December 2, 2015; Tomasso insisted (incorrectly) that it did not explain the reasons.  Id. at 350.  At this point, it is clear from the transcript that Caesar had had enough – he told Tomasso and Adams that they were "retaliating against [him] for taking statements . . . from an employee" and walked out of the meeting.  Id. at 351, 418.  Not caught on the recording, but undisputed is that Caesar told Tomasso and Adams that he was "going back to work," but "if you were to fire me, I'm going to do what I have to do."  PSUF ¶ 134; DSUF ¶ 59.

Despite Caesar's statement that he was returning to work, Tomasso and Adams claim to believe that Plaintiff had "walked off the job." DSUF ¶ 61. When they realized he was at his desk, Tomasso asked him to leave. DSUF ¶ 62. Caesar asked for a reason in writing; after threatening to call the police, Tomasso provided Caesar with a letter informing him he was on administrative leave. Id.; PSUF ¶¶ 135-36. During this interaction, it is undisputed that Caesar was not hostile or irate; he left peacefully. DSUF ¶ 136.

Once Caesar was on leave, Adams and Josh Varone, AAA's HR Director, discussed calling Caesar by phone "to see if we could continue the conversation from the other night," although the record does not reflect what (after almost two hours of meetings with AAA management), if anything, they believed they still needed to find out. DSUF ¶ 63. Varone called Caesar on December 7, 2015, and asked him to come in "to continue the Club's investigation." DSUF ¶ 64. The parties dispute whether this was a ruse, in that the investigation was really complete. PSUF ¶ 138; DSUF ¶¶ 58-59, 64. Caesar refused to come. DSUF ¶ 64; PSUF ¶ 139. AAA claims (and Caesar disputes) that, at this point in the sequence of events, it decided to terminate Plaintiff's employment. DSUF ¶ 65. It is undisputed that this was a decision that "everyone [on AAA team] has to agree on." DSUF ¶¶ 65, 67. As reasons for Caesar's termination, AAA relies on the following: (1) that it found that Caesar had retaliated against Duclaw for complaining about his management style and the Thanksgiving Call by removing her from her training position; (2) that Caesar failed to participate fully in the internal investigation by refusing to return to continue to answer questions as mandated by AAA's Code of Conduct; and (3) that Caesar engaged in unprofessional behavior after he ended the meeting with Tomasso and Adams. DSUF ¶ 66; PSUF ¶ 161. The foundation for the third reason is Adams' testimony that Caesar "caused a [ruckus], raised voices, yelling" when he returned to his desk. See ECF

14

No. 22-4 at 9.  Despite giving this reason, AAA does not rely on this testimony; rather, it does not dispute Caesar's testimony that he was neither irate nor hostile and left AAA peacefully. PSUF ¶ 136.  Caesar disputes that these are the true reasons for his termination.  What is undisputed is that on December 8, 2015, Tomasso and Adams told Caesar that he was being terminated effective immediately.  DSUF ¶ 68.

Less than a week later, on December 14, 2015, AAA issued counseling notices and a disciplinary warning to the nightshift employees whose conduct had been found to be inappropriate during the December 2-3, 2015, investigation.  DSUF at ¶ 69.  Duclaw was counseled for "loud" and "unprofessional" conversations.  Id.; 20-1 at 104.

## II.   <u>Standard of Review</u>

Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  <u>Taylor v. Am. Chemistry Council</u>, 576 F.3d 16, 24 (1st Cir. 2009) (internal quotation marks omitted).  A fact is material only if it possesses the capacity to sway the outcome of the litigation; a dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the nonmoving party.  <u>Estrada v. Rhode Island</u>, 594 F.3d 56, 62 (1st Cir. 2010).  The evidence must be in a form that permits the court to conclude that it will be admissible at trial.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  "[E]vidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve."  <u>Vasconcellos v. Pier 1 Imports (U.S.), Inc.</u>, C.A. No. 06-484T, 2008 WL 4601036, at *3 (D.R.I. Apr. 28, 2008) (internal quotation marks omitted).

In ruling on a motion for summary judgment, the court must examine the record evidence in the light most favorable to the nonmoving party; the court must not weigh the evidence or reach factual inferences contrary to the opposing party's competent evidence.  Tolan, 572 U.S. at 660.  In employment cases, summary judgment is appropriate when the party opposing the motion "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000) (internal quotation marks omitted).  The motion must be denied if there is sufficient evidence from which a reasonable jury could infer that the adverse employment action was based on discriminatory animus or that the employer's articulated reason is a sham and the true reason is discriminatory.  Trainor v. HEI Hosp., LLC, 699 F.3d 19, 27-28 (1st Cir. 2012); Smith v. F.W. Morse & Co., 76 F.3d 413, 421 (1st Cir. 1996).  When pretext and retaliatory animus are at issue, "[c]ourts should be especially cautious before granting summary judgment.  Harrington v. Aggregate Indus.-Ne. Region, Inc., 668 F.3d 25, 33 (1st Cir. 2012).

## III.   Law and Analysis

Caesar claims that AAA fired him in retaliation for his opposition to AAA's lackadaisical approach to sexual harassment in the workplace expressed through his repeated protected emails, culminating in the November 28, 2015 email, which reflects the taking of statements memorializing inappropriate conduct by certain employees that might be exposing the call center nightshift staff to a sexually hostile environment.  He brings his retaliation claim pursuant to Title VII and also invokes Rhode Island's FEPA and RICRA, each of which relies on the same analytical framework.  Barboza v. Town of Tiverton, C.A. No. 07-339-ML, 2010 WL 2231995, at *5 (D.R.I. June 2, 2010).  The Court will analyze the Title VII, FEPA, and RICRA actions together, using the Title VII framework.  See id.

16

The pertinent anti-retaliation provision of Title VII provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] <u>has opposed any practice made an unlawful employment practice by [Title VII]</u>, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

42 U.S.C. § 2000e-3(a) (emphasis added). In this case, Caesar claims he had "opposed" AAA's requiring nightshift employees to work in a hostile environment due to sexually harassing conduct by co-workers, which is an employment practice made unlawful by Title VII. <u>Franchina v. City of Providence</u>, 881 F.3d 32, 45 (1st Cir. 2018). As used in Title VII, the term "'oppose' . . . carries its ordinary meaning: to resist or antagonize . . .; to contend against; to confront; resist; withstand." <u>Rodríguez-Vives v. P.R. Firefighters Corps of P.R.</u>, 743 F.3d 278, 284 (1st Cir. 2014) (quoting <u>Crawford v. Metro. Gov't of Nashville & Davidson Cnty.</u>, 555 U.S. 271, 276 (2009)). The First Circuit has interpreted this provision as casting a very broad "protective cloak." <u>See</u> <u>Rodríguez-Vives</u>, 743 F.3d at 284. Based on this interpretation, it is unlawful for an employer to retaliate because an employee complained to a supervisor about conduct constituting sex discrimination. <u>See, e.g.</u>, <u>Tuli v. Brigham & Women's Hosp.</u>, 656 F.3d 33, 41-43 (1st Cir. 2011). That is, retaliation for informal opposition of a discriminatory employment activity is sufficient to violate Title VII. <u>Franchina</u>, 881 F.3d at 45. Further, to establish participation in a protected activity under the opposition clause, the plaintiff need not show that the conditions he or she opposed "actually amounted to a violation of Title VII." <u>Fantini v. Salem State College</u>, 557 F.3d 22, 32 (1st Cir.2009) (internal quotation marks omitted). Nor must he establish that the conduct was directed at him personally. <u>Collazo v. Bristol-Myers Squibb Mfg., Inc.</u>, 617 F.3d 39, 48 (1st Cir. 2010) (retaliation for opposition to sexual harassment of co-worker is actionable). Instead, a plaintiff must demonstrate only that he had "a good faith, reasonable

belief that the underlying challenged actions" were unlawful.  Id. (internal quotation marks omitted).  When an employee communicates to the employer his belief that it has engaged in employment discrimination, that communication constitutes the employee's opposition to the activity.  Id. at 47 (citing Crawford, 555 U.S. at 276).

To make out a *prima facie* case of retaliation under the familiar burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-03 (1973), Caesar must prove that (1) he engaged in protected activity under Title VII, (2) he suffered an adverse employment action, and (3) the adverse employment action was causally connected to the protected activity.  Collazo v, 617 F.3d at 46; Fantini, 557 F.3d at 32.  A plaintiff's burden at the *prima facie* stage is a lenient one.  Soto-Feliciano v. Villa Cofresi Hotels, Inc., 779 F.3d 19, 30 (1st Cir. 2015).  If Caesar has established a *prima facie* case, the burden shifts to AAA to articulate a legitimate, non-retaliatory reason for its employment decision.  Roman v. Potter, 604 F.3d 34, 39 (1st Cir. 2010).  If AAA has met this burden, "the burden shifts back to [Caesar] to show that the proffered legitimate reason is in fact a pretext and that the job action was the result of [AAA's] retaliatory animus."  Id. (cleaned up); see Collazo, 617 F.3d  46.

AAA's motion contends that Caesar has failed to establish a *prima facie* case of retaliation because he cannot show either that he engaged in protected activity, or causation.  ECF No. 19-1 at 24-35.  It argues further that, even if the Court accepts that Caesar has met the relatively low bar for a *prima facie* case, his claim fails because there is no evidence of pretext to rebut AAA's legitimate reasons for terminating his employment.  Id. at 35-37.  Caesar counters that he has proffered evidence of protected activity, causation and pretext sufficient for a jury to find that he was terminated in retaliation for his opposition to what he reasonably believed was sexually harassing workplace conduct by certain nightshift employees potentially serious enough

to expose the nightshift staff to a hostile work environment in violation of Title VII.  ECF No. 21.

A.    Protected Activity

A reasonable jury could well find that Caesar actively opposed AAA's laissez-faire indifference to potentially sexually harassing workplace conduct of nightshift employees through his emails of September 8, October 5, October 28 and December 2, 2015, capped off by his taking statements and passing them on in the November 28, 2015 email, which urged (for at least the second time) that "sexual harassment/discrimination/Sensitivity training" is needed and warned that "employees . . . are genuinely concerned about their work environment."  ECF No. 22-1 at 52.  These communications were addressed to (or eventually made their way to) various of the entire management team of Newton, Galego, Adams and Tomasso.  That AAA understood these emails as raising potentially serious matters is confirmed by AAA's actions and statements when it finally was forced to pay attention because of the statements attached to the November 28, 2015 email.  Having ignored Caesar since September, it finally initiated an investigation; as Tomasso told Caesar, AAA was "having conversation with the employees [to] enforce what you're trying to do."  ECF No. 20-1 at 329.

AAA attempts to counter the force of this proffer with the argument that Caesar merely passed a report of employee complaints "up the supervisory chain."  Chagnon v. Lifespan Corp., No. 15-493S, 2017 WL 3278952, at *7, 10 (D.R.I. June 19, 2017), adopted, 2017 WL 3278858 (D.R.I. Aug. 1, 2017) (internal quotation marks omitted) (employee who merely "chimed in" along with others who had initiated discussion of topic of concern did not engage in arguably "protected activity").  This argument collapses in the face of the proffered facts, which are more than sufficient to establish that Caesar's opposition to what was going on during the nightshift

19

was not merely the passing on of two statements.  To the contrary, a fact finder could readily

conclude that Caesar's sequence of emails warning that AAA could face liability and urging it to

provide sexual harassment training resulted from his good faith belief[8] that an inappropriately

sexualized working environment was being forced on his supervisees, as well as that he procured

and passed on the supporting statements only because his earlier emails had been ignored.  That

is, the "passing on" of the statements was not an isolated action but rather was part and parcel of

the opposition that he had initiated with his first email on September 8, 2015.  Confirming this

link is Caesar's post-meeting email of December 2, 2015, in which he defended his action in

taking statements from employees who "feel they are working in a hostile environment" by

reminding Newton and the rest of the management team that, "I expressed my concern with you

a few months ago about the lack of training on the overnight team and asked that you provide

videos for sexual harassment in the workplace because of what I witnessed personally. . . .  You

didn't respond to this and you never provided updated policies and procedures for the Overnight

Team."  ECF No. 22-1 at 58-59.

---

[8] Citing Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 174 (1st Cir. 2003), AAA argues that Caesar's factual proffer does not permit the inference that he communicated to AAA a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law," as required by Fantini, 557 F.3d at 32 (internal quotation marks omitted).  ECF No. 19-1 at 28.  This argument may be given short shrift.  While Caesar was certainly vague about what was the precise conduct that troubled him, he was crystal clear in telling AAA (repeatedly) that what he saw and heard during the nightshift was of a nature that "could possibly turn into [a] liability issue for [AAA]," that was "enough to offend another employee in my opinion," and that exposed the need for "sexual harassment" training.  ECF No. 22-1 at 2, 39, 59.  Moreover, when AAA finally did pay attention to Caesar's "opposition," its own investigation resulted in the finding that that there may have been conversations that may have included sexual references, albeit not serious enough to transgress Title VII.  DSUF ¶ 69.  Relatedly, equally flat is AAA's argument that Caesar is so sophisticated (based on having received sexual harassment training from other employers) that he could not possibly have reasonably believed that loud conversation violates Title VII.  ECF No. 19-1 at 29-30.  While Caesar certainly did also complain about employees who were too loud, those complaints are not the basis for his Title VII claim.

Nor can AAA colorably invoke the so-called "manager rule,"[9] which holds that "a management employee [who], in the course of her normal job performance, disagrees with or opposes the actions of an employer does not engage in 'protected' activity.'" Brush, 466 F. App'x at 787 ("an employee must cross the line from being an employee performing her job . . . to an employee lodging a personal complaint") (internal quotation marks omitted).  As our Circuit assumed without deciding in Collazo, "to engage in protected activity [in a Title VII claim] . . . 'the employee must step outside his or her role of representing the company' and take 'some action adverse to the company.'"  617 F.3d at 48-49 (quoting Claudio-Gotay v. Becton Dickinson Caribe, Ltd., 375 F.3d 99, 102 (1st Cir. 2004)).  Here the evidence of AAA's harsh criticism of Caesar's conduct in buttressing his earlier warnings of a sexually harassing workplace by collecting and passing on statements is more than enough to demonstrate that he had "step[ped] outside his . . . role of representing the company" and was taking some "action adverse to the employer, actively assist[ing] other employees in asserting [Title VII] rights." Becton Dickinson, 375 F.3d at 102 (internal quotation marks omitted).  As AAA's own memorandum of what happened during Caesar's December 1, 2015, meeting with Newton and Galego reflects, Newton unambiguously told Caesar that he "should not be taking statements from employees."  ECF No. 20-1 at 435-36.  A jury might also consider that Caesar rebutted Newton's statement with the question, "[y]ou want me to suppress all of this[?]," id. at 436, as

---

[9] Whether the "manager rule" will be applied in our Circuit to Title VII cases is not yet known.  At present, those circuits that have addressed the issue have come to different conclusions.  Compare Brush v. Sears, 466 F. App'x 781, 787 (11th Cir. 2012) (applying manager rule to Title VII claim); Weeks v. Kansas, 503 F. App'x 640, 642 (10th Cir. 2012) (same); EEOC v. HBE Corp., 135 F.3d 543, 554 (8th Cir. 1998) (applying manager rule in context of Title VII claim, but concluding that employee did step outside of normal employment role), with Demasters v. Carilion Clinic, 796 F.3d 409, 423-24 (4th Cir. 2015) (not applying manager rule to Title VII claim); Littlejohn v. City of New York, 795 F.3d 297, 317 n.16 (2d Cir. 2015) (manager rule inapposite in context of Title VII); Johnson v. Univ. of Cincinnati, 215 F.3d 561, 579-580 (6th Cir. 2000) (only qualification on protection from retaliation under Title VII opposition clause is that manner of opposition be reasonable).  In light of the clear facts establishing that Caesar's decision to take statements "step[ped] outside [of] his . . . role of representing the company," this issue need not be determined in this case.  Collazo, 617 F.3d at 48.

well as that Newton did not respond; this permits the inference that AAA considered all of

Caesar's efforts to improve the working environment for his supervisees to be outside his

purview.

Mindful that federal courts have taken an "expansive view of what constitutes

oppositional conduct under Title VII," I find that Caesar has presented more than enough to

support the inference that he engaged repeatedly in "protected activity" though his emails[10] in

opposition to AAA's indifference to the alleged sexually charged unlawful conduct tainting the

working environment of the employees working in the nightshift call center.  See Pippin v. Blvd.

Motel Corp., 835 F.3d 180, 185 & n.4 (1st Cir. 2016) (internal quotation marks omitted).

B.    Causal Connection

For a *prima facie* case, the causation bar is set low.  A Title VII claimant must show just

that there is some causal connection between his protected activity and his termination, with

temporal proximity alone enough to suffice.[11]  Collazo, 617 F.3d at 49-50 (citing DeCaire v.

Mukasey, 530 F. 3d 1, 19 (1st Cir. 2008)).  Here, there is clearly temporal proximity.  The

confusing events[12] that resulted in Caesar's termination were undisputedly set in motion by his

---

[10] To be clear, my finding is that each of Caesar's emails – September 8, October 5, October 28, November 28 and December 2, 2015 – amounts to protected activity.  AAA ignored the first three and the last, permitting the inference that it was content to allow sexual misconduct to pervade the working environment for nightshift staff.  Only the November 28, 2015 email triggered a reaction; a fact finder could infer that is because of Caesar's decision to include the statements that AAA's management could not ignore.  Importantly, AAA's primary reaction to the email was to excoriate Caesar for taking the statements.  Further, it was AAA's reaction to that email that set in motion the events that resulted in Caesar's termination.  Therefore, it alone constitutes the protected activity that allegedly is actionable; however, a fact finder can and should examine it in context, mindful of Caesar's less effective efforts to get AAA's attention through protected activity prior to and after it.

[11] Before a court may infer causation from temporal proximity, the employee must present evidence that the decisionmaker was aware of the protected activity.  Allard v. Citizens Bank, 608 F. Supp. 2d 160, 171 (D. Mass. 2009).  Caesar has done so.  His evidence establishes that each of his emails constituting protected activity was directed to some or all of the AAA management group who subsequently concurred in the decision to recommend termination.

[12] This is not a case where "another explanation [for the termination] . . . is so obviously correct" that it renders Plaintiff's position (based solely on a temporal inference) "implausible."  See Maloy v. Ballori-Lage, 744 F.3d 250, 253 (1st Cir. 2014).  Rather, the co-occurring and intervening events – the Thanksgiving Call, Caesar's removal of a

protected activity in sending the November 28, 2015 email, with the employee statements that AAA could not ignore.  Within four days he was placed on leave and less than two weeks later he was fired.  This is enough to for a *prima facie* showing of causation.

      C.     Pretext

AAA readily clears the second obstacle in the McDonnell Douglas trifecta by articulating three "legitimate, non-discriminatory reason[s]"  for its adverse employment action in firing Caesar – (1) Caesar retaliated against Duclaw; (2) Caesar refused to continue to answer questions in connection with AAA's investigation; and (3) Caesar was unprofessional after he left the December 2, 2015 meeting.  Theidon v. Harvard Univ., 948 F.3d 477, 495 (1st Cir. 2020).  Therefore, the Court's analysis must continue to "the ultimate issue: whether, viewing the record as a whole and taking all inferences in [Caesar]'s favor, a reasonable jury could find that [AAA]'s stated reasons for his termination were a pretext for unlawful retaliation."  Collazo, 617 F.3d at 50.

Pretext may be inferred from evidence permitting a jury to conclude that that stated reasons are not the real reason.  Id. at 51.  "'[W]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason' may also allow 'a factfinder [to] infer that the employer did not act for the asserted non-discriminatory reasons.'"  Lincare, 989 F.3d at 160 (quoting Pina v. Children's Place, 740 F.3d 785, 797 (1st Cir. 2014)).  In particular, if some of the given reasons are false, "a sham intended to cover up the employer's real and unlawful motive of discrimination[,]" Theidon, 948 F.3d at 495 (internal quotation

---

trainee from Duclaw, various employees' complaints about Caesar's supervision style and Caesar's emotional reaction (and resulting refusal to continue) after being grilled for almost two hours largely about his protected activity while AAA seemed to continue to ignore his opposition to sexual harassment – create a factual mess appropriate to be untangled by a jury.

marks omitted), the case must proceed to a fact finder for the ultimate determination.  <u>Lincare</u>, 989 F.3d at 161.

In this case, a reasonable jury's pretext analysis might begin with the ample evidence surrounding AAA's reaction to the conduct that it did not cite as a basis for termination – Caesar's taking statements from nightshift employees and passing them on via his November 28, 2015 email.  This protected action is a primary topic of Caesar's December 2015 meetings with AAA, first with Newton and Galego and then with Tomasso and Adams.  As AAA's own summary of the first meeting establishes, Newton was so aggressive in pressing this as Caesar's breach of an absolute prohibition that Caesar understood he was being terminated for it: "Am I being fired because of collecting statements?"  ECF No. 20-1 at 435.  While conceding that AAA actually had no such policy, Tomasso also focused on Caesar's taking of statements.  ECF No. 20-1 at 292.  When Caesar told Tomasso that Newton had "attacked" and "intimidated" him into believing that he would be fired in retaliation for taking statements, Tomasso explained that "[HR] like[s] to have ownership of those things," but she never contradicted that proposition. <u>E.g., id.</u> at 299-302.  In his post-meeting email of December 2, 2015, Caesar raised the same theme, challenging AAA's skewed priorities in reprimanding him for passing on statements while continuing a pattern of ignoring his efforts at raising employees' concerns about inappropriate workplace conduct.

From this evidence, a reasonable jury could conclude that Newton's threat of firing for taking statements reflects the real reason why the AAA management wanted Caesar gone, and that AAA's continuation of the investigation after that was a ruse to drive Caesar either to resign or to refuse to cooperate, giving AAA a "reason" to fire him.[13]  <u>Nemeth v. Citizens Fin. Grp.,</u>

---

[13] For example, the evidence permits the inference that AAA's investigators did not seem interested at all in Caesar's written descriptions of the underlying events; indeed, at the meeting, Tomasso did not appear even to have

Inc., No. 2:08-cv-15326, 2011 WL 2531200, at *11-14 (E.D. Mich. June 24, 2011) (jury may infer pretext from evidence that employer did not really believe its own legitimate, non-discriminatory reason where questioning during multi-hour-long investigation focused almost entirely on employee's protected status with little attention to supposed underlying issue); Griffiths v. CIGNA Corp., 857 F. Supp. 399, 407-08 (E.D. Pa. 1994), aff'd, 60 F.3d 814 (3d Cir. 1995) (reasonable for jury to find investigation, with its focus on employee and not on alleged thefts, was a sham designed to elicit response from employee on which employer could premise discharge based on refusal to cooperate).  This is enough to warrant a trial.  See Perez v. New Jersey Transit Corp., 341 F. App'x 757, 761-62 (3d Cir. 2009) (while employee's refusal to cooperate in investigation usually is legitimate reason for termination, jury can find it pretextual if investigation itself was excessive response to underlying complaint).

Turning to AAA's three stated reasons for termination, I also find that a reasonable jury might draw inferences adverse to AAA from Caesar's proffered facts that could yield the conclusion that some or all of them are pretextual, leaving only the inference that AAA was motivated by its desire to retaliate against Caesar for his protected activity.

For starters, there is significant evidence that the third reason – unprofessional conduct after Caesar left the December 2, 2015 meeting – is entirely false.  While Adams testified to Caesar having yelled and made a ruckus, AAA has acknowledged that it is undisputed that Caesar was not irate or hostile, and that he left peacefully.  This is enough to suggest that a jury might conclude at least one of the three given reasons was false or exaggerated.  If so, it is not a stretch for the jury to find that AAA would not have gone to such lengths to concoct a third false

---

read Caesar's explanation for removing the trainee from Duclaw.  Similarly, permitting the inference that the goal of the meeting was to cause Caesar to engage in conduct worthy of firing is the inaccurate conclusion of both Tomasso and Adams after the meeting that Caesar's departure amounted to "walk[ing] off the job."  DSUF ¶ 61.

reason, if its true reason had been both sufficient and legally permissible to result in termination. Lincare, 989 F.3d at 161; Joll v. Valparaiso Cmty. Sch., 953 F.3d 923, 932 (7th Cir. 2020) (if jury "does not believe the employer's explanation for its decisions, it may infer that the employer is trying to cover up . . . discrimination . . . particularly if disbelief is accompanied by a suspicion of mendacity") (cleaned up).

The first reason – that Caesar retaliated against Duclaw by removing the trainee – is factually fraught, with enough to cause a fact finder to question whether it too is a sham. For example, Caesar claims that the pertinent conduct was grounded directly in his unaddressed concern about Duclaw's pattern of sexually inappropriate language. His claim is corroborated by AAA's memorandum of the December 1, 2015 meeting, which confirms that Caesar raised the question of "employees [who] needed to be trained on sensitivity," ECF No. 20-1 at 436, and that he specifically asked Newton whether it was appropriate for Duclaw to be a trainer; Newton's only guidance was to tell Caesar that he had the absolute authority to make the decision about who does training. The exchange permits the inference that Caesar's action in removing the trainee from Duclaw was not a firing offense but had been expressly sanctioned by his supervisor. As to the likelihood that Caesar acted to retaliate, a fact finder might consider that Caesar was not embittered towards Duclaw in that, during the Newton meeting, Caesar acknowledged that Duclaw "did a good job on the [Thanksgiving C]all" and that, for himself, hanging up on a member "won't happen again." ECF No. 20-1 at 435. In short, a reasonable jury might well conclude that this "reason" for terminating Caesar was a sham or, if a true reason, was insufficient to justify firing.

That leaves AAA's best reason – Caesar's defiance of his "duty" as an employee to continue "to fully cooperate in . . . [AAA's] investigation[]. ECF No. 20-1 at 22 (AAA "Code of

Conduct"). It appears clear that Caesar abruptly left the December 2, 2015 meeting with Tomasso and Adams; it is undisputed that he refused Varone's request that Caesar come in "to finish the conversation that he had started with Mr. Adams and Stephanie Tomasso during the Club's investigation of complaints from Call Center employees." ECF No. 20-1 at 452. Nevertheless, Caesar's undisputed refusal to continue to cooperate in AAA's investigation is not case-ending. First, a jury could find pretext in that AAA's decision to add two sham reasons to gussy up a real reason is enough to permit the inference that the real reason alone would not normally lead to termination. Lincare, 989 F.3d at 161. More importantly, also trial-worthy is the parties' intense dispute over whether the investigation was really completed, including what more investigation did AAA really believe it needed to conduct. See Nemeth, 2011 WL 2531200, at *11-14 (if questioning is protracted and focused almost entirely on employee's protected status with little attention to supposed underlying issue, jury may infer pretext from firing based on refusal to cooperate). While pretext cannot be based on nothing more than the assertion that the employer's "investigation was poorly done [or] unfair," Solola v. Prospect CharterCare RWMC, LLC, C.A. No. 16-35 WES, 2019 WL 1382279, at *6 (D.R.I. Mar. 27, 2019), appeal dismissed, No. 19-1415, 2019 WL 5549329 (1st Cir. July 26, 2019), where, as here, a fact finder reasonably could conclude that AAA was planning to continue questioning Caesar without purpose in the hope that Caesar might be driven to refuse to continue or to resign, summary judgment must be denied.

IV.   **Conclusion**

As in Lincare, the record here has much evidence from which a reasonable jury might well conclude that AAA did not act in a discriminatory manner and that its decision to terminate Caesar was not driven by its desire to retaliate against him for sending the November 28, 2015

email with employee statements that it could not ignore.  My finding is simply that there is

enough for a jury to conclude otherwise.  Therefore, I recommend that AAA's motion for

summary judgment (ECF No. 19) be denied.

Any objection to this report and recommendation must be specific and must be served

and filed with the Clerk of the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P.

72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes

waiver of the right to review by the district judge and the right to appeal the Court's decision.

See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v.

Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
May 6, 2021